**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**CPC REFERENCE LABORATORIES, INC.**                                    **PLAINTIFF**

**VS**                                                              **NO.: 3:07CV65**

**LABORATORY CORPORATION OF**
**AMERICA**                                                         **DEFENDANTS**


## ORDER

This cause comes before the court on the separate motions of plaintiff and defendant seeking complete or partial summary judgment relief in this case. Defendant Laboratory Corporation of America ("LabCorp") seek complete summary judgment, or alternatively, partial summary judgment as to damages, as to plaintiff CPC Reference Laboratories, Inc.'s ("CPC") claims against it. LabCorp also seeks summary judgment as to a counterclaim which it has filed, alleging failure to pay it for certain medical laboratory testing performed at CPC's request. For its part, plaintiff seeks partial summary judgment as to its claim that defendant breached the provisions of a confidentiality agreement which the parties executed in this case. The court concludes that the parties' claims against each other must be resolved by a jury at trial, and the motions for summary judgment will therefore be denied.

This is, *inter alia*, a breach of contract action arising out of LabCorp's planned purchase of certain assets of plaintiff CPC for $3 million, with $ .5 million of that amount contingent upon CPC's meeting certain business goals. Prior to July 2008, when it was ordered to cease all laboratory testing operations, CPC was a Mississippi-based laboratory testing business with its

1

headquarters in New Albany. Defendant LabCorp is a nationwide company which is likewise in the laboratory testing business. Between November 2006 and May 2007, LabCorp negotiated with CPC regarding the potential purchase of the latter's assets, and on April 18, 2007, the parties executed an Asset Purchase Agreement ("APA"), the alleged breach of which is at the heart of this case. The APA provided for a planned closing date on May 14, 2007, but defendant developed misgivings which caused it to withdraw from the deal on May 17, 2007. Feeling aggrieved, plaintiff filed the instant action in this court.

As noted previously, plaintiff and defendant each seek complete or partial summary judgment as to numerous claims and counterclaims which they assert in this case. Only a small portion of the arguments raised by the parties relate to issues of law, with the majority of the parties' extensive briefings involving a description of facts which, they contend, assist their respective cases. It is occasionally the case that the facts will be so overwhelmingly in favor of one party that summary judgment is in order, but, generally speaking, fact issues are best resolved by juries. At the same time, it is apparent that defendant has powerful evidence as it relates to the dispute at the heart of this lawsuit. Indeed, the record indicates that CPC has had an extensive history of regulatory violations which culminated in it being ordered to cease testing by regulatory authorities. Clearly, such a record of violations would give any prospective purchaser pause to re-consider the wisdom of going forward with any planned purchase. It is apparent, however, that, at the time the most serious such violations were committed, the parties were already bound by the terms of the APA, the terms of which only provided limited bases for defendant to withdraw from the deal.

Defendant argues that the APA contains conditions precedent which were not met in this

2

case and which therefore entitled it to back out of the purchase. In particular, defendant relies

upon provisions in the APA which require that:

> (1) all representations and warranties of Seller contained in this agreement must be "true, correct, and complete in all material respects" as of April 18, 2007 and as of the closing date (§ 7.1); (2) Seller shall not have incurred liabilities that would result in "a material adverse change in assets, liabilities or the financial condition or business of seller" and "no event shall have occurred or circumstances exist that may, or could reasonably be expected to, result in such a material adverse change" (§ 7.4); and, (3) "Purchaser shall be satisfied, in its sole and absolute discretion, with the results of its due diligence investigation of the Business and Purchased Assets" (§ 7.9).

Defendant further notes that, in executing the APA, CPC represented, warranted and promised

the following:

> (1) CPC was "in good standing under the laws of the State of Mississippi" (§ 4.1) and in compliance "with government laws, rules and regulations" (§ 4.11);
> (2) CPC "owns, holds or possesses all licenses, franchises, permits, privileges, immunities, approvals and other authorizations from a Governmental Body which are necessary to entitle it to own or lease, operate and use the Purchased Assets and to carry on and conduct the Business as currently conducted (§ 4.10);
> (3) there is no action, suit, proceeding or claim pending or, to the knowledge of Seller Parties, threatened against CPC (§ 4.12); and
> (4) any documents provided by CPC in due diligence are considered representations and warranties (§ 4.25) and CPC has been truthful in every representation and warranty made (§ 4.26).

Defendant suggests that the regulatory violations by plaintiff, and the failure to disclose same,

constitute failures of conditions precedent which justified its withdrawing from the planned

purchase. Specifically, defendant argues in its brief as follows:

> As set forth in LabCorp's Statement of Undisputed Facts, the Clinical Laboratory Improvement Amendments of 1988 ("CLIA") are the primary licensing authority for clinical labs. All clinical labs are required to be inspected every two years by the Centers for Medicare and Medicaid Services ("CMS"). CMS is responsible for certifying or decertifying labs under CLIA. The CLIA division of the Mississippi Department of Health ("MDH") performs the inspections of the Mississippi laboratories and makes recommendations to CMS.

3

However, CMS ultimately determines whether a lab will remain certified pursuant to CLIA. CMS has broad enforcement powers and may order labs to cease performing certain tests or, as occurred here, may require that the lab cease all testing in effect closing the lab.

LabCorp requested CPC's CLIA record in negotiations. CPC admits that it did not disclose the complete history, depth and severity of its CLIA violations to LabCorp. In fact, this Court asked CPC's counsel whether CPC produced its CLIA records to LabCorp during negotiations and counsel responded "[CPC] submitted some of the quality lab proficiency testing results…I do not believe, standing here, that every single proficiency testing result and survey testing result was given to LabCorp during the negotiations, no, I do not." In fact, CPC did not disclose the CLIA problems in the APA schedules relevant to its permits, pending claims or liabilities. Further, CPC did not disclose its problems to LabCorp when LabCorp met in person with CPC's medical director, Dr. John Fullenwider.

LabCorp became aware of CPC's serious CLIA problems when LabCorp called the MDH to inquire as to how to transfer CPC's CLIA number to LabCorp in preparation for closing. MDH's Theresa Irwin provided LabCorp with the change in ownership form ("CHOW") and at the same time gave LabCorp a "heads up" that there had been a recent inspection of the lab and that deficiencies had been cited. In response, Kyle Farquhar, LabCorp's technical director phoned Irwin at MDH for more information. The testimony of Irwin and Farquhar is consistent that on the call Irwin told Farquhar that CPC "had a long history of noncompliance with CLIA." Irwin further advised Farquhar that LabCorp could not apply for a new CLIA number, that CPC's CLIA number and accompanying history would transfer to LabCorp, and that LabCorp would be responsible for remedying the problems.

When LabCorp expressed concern to CPC about its CLIA record the week prior to the anticipated close, CPC blatantly attempted to mislead LabCorp as to its CLIA status. CPC produced a single, successful proficiency testing result on May 16, 2007. The test result was sent by email from CPC's counsel which stated, "[a]t last week's call, there was concern expressed regarding how well run the CPC lab was. Attached is a proficiency test result, which shows that the lab has done well on its proficiency testing." This single test result shows CPC's 100% compliance with proficiency testing. CPC produced the result to give LabCorp the impression that CPC enjoyed successful participation in the CLIA proficiency testing program. This representation was absolutely false and Exhibit 6 is direct evidence of CPC's willful attempt to mislead LabCorp.

In fact, CPC had serious CLIA performance issues and was in breach of its warranties in the APA. One material fact is certain from the objective testimony

of Theresa Irwin and her colleague at MDH, Jan Smith: CPC's failures to meet CLIA regulations were significant, so significant that Theresa Irwin regarded CPC's laboratory as "the worst" laboratory in Mississippi (out of 600 laboratories) with regard to proficiency testing. When Ms. Smith was asked her opinion of CPC's proficiency testing record, "1 being good and 5 being poor," she answered "5". These statements alone, without any proof from CPC to contradict these findings, demonstrates that CPC did not comply with the first warranty listed above -- CPC was not "in good standing under the laws of the State of Mississippi" (§ 4.1) and was not "in compliance with government laws, rules and regulations" (§ 4.11).

Irwin testified that from 2005-2007, CPC received 14 condition-level deficiencies at the lab. Each of these test results were violations of government laws, rules, and regulations because they were violations of the proficiency testing requirements of CLIA. Irwin also stated that CMS was placing more and more value on proficiency results, and that a repeat failure may shut a laboratory down. There is nothing left to interpretation from the Irwin and Smith testimony--CPC's CLIA record was bad, and in violation of the warranties in § 4.1 and § 4.11 of the APA. Compliance and good standing with CLIA, CMS and MDH were clearly conditions precedent to the closing of the sale. The evidence in this case shows that as of the date of the APA's execution, April 18, 2007, and as of the anticipated date of closing on the APA, May 14, 2007, CPC had significant CLIA deficiencies that rendered CPC's warranties and representations untrue. This triggered LabCorp's option not to close. CPC cannot prove that it complied with the condition to close in § 7.1.

Clearly, these constitute powerful facts in favor of defendant's case, and plaintiff may find it difficult to overcome them at the trial.

At the same time, plaintiff has presented its own version of events which suggest that fact issues exist which should be resolved by a jury. For example, plaintiff cites Theresa Irwin's testimony for the proposition that "up until and including the survey in April of 2007, CPC had never been denied re-certification for its laboratories" and it argues that this testimony indicates that it was in good standing with the State of Mississippi. Defendant notes, however, that Irwin also testified that, in the important area of proficiency testing, she considered CPC to be the worst lab in the state. Even assuming that CPC is a poor laboratory, however, the relevant issue

5

is whether plaintiff misrepresented that it was "in good standing under the laws of the State of Mississippi" and was "in compliance with government laws, rules and regulations."

In the court's view, it is for a jury to determine whether CPC had such a poor regulatory record that it should be considered to have misrepresented that it was in compliance with relevant laws and regulations. Defendant does appear to have rather strong proof as it relates to this issue, but it is generally not the role of this court, on summary judgment, to weigh the facts in a case in which both parties have submitted such voluminous evidence.[1] This court is particularly hesitant to do so in this case, given the stakes involved for the two businesses. Indeed, in plaintiff's case, the outcome of this litigation may well determine the future of its company, and the court concludes that it should be given an opportunity to present its evidence at trial. The court does not rule out the possibility that it will rule adversely to plaintiff at the directed verdict stage, but it is apparent that plaintiff has evidence which at least merits being presented at trial.

For example, plaintiff provides evidence which, it suggests, demonstrate another potential motivation for defendant's withdrawing from the planned purchase, namely the loss of an important customer:

> On April 30, 2007, LabCorp and CPC were informed that the Oxford, Mississippi Clinic for Women (the "OCW") would no longer be a customer if LabCorp purchased CPC. OCW was one of CPC's largest and most lucrative customers, representing more than 20% of CPC's revenue. On April 30, 2007, Mr. Whiteside, of CPC, and Mr. Scott of LabCorp simultaneously received from Ira Couey, M.D., the owner of OCW, the letter in Exhibit V, indicating that, because LabCorp was purchasing CPC, OCW would no longer be utilizing CPC's services. Mr. Huff was visiting OCW with Mr. Whiteside at the time (Deposition of Scott Huff, pp. 23-25, 41-42 in Exhibit F). Mr. Robert Sevasten of LabCorp

---

[1]For example, in opposing defendant's motion for summary judgment, plaintiff has submitted thirty-four exhibits, each of which must be considered in the light most favorable to it, as the non-moving party.

testified that such a loss is to be expected in the purchase of another laboratory, LabCorp Depo in Exhibit C, pages 17, 57 and 58.

       After this joint visit to the OCW, and despite the fact that a valid APA had been executed, Mr. Huff recommended to LabCorp executives, Scott Evans and Kathy Cook, that <u>LabCorp should not purchase CPC, based upon the "los[s] of one of the biggest customers"</u> (Deposition of Scott Huff, p. 27-28 in Exhibit F). In fact, the loss of OCW was so significant that Kathy Cook testified that Scott Huff was shaken by the event. Deposition of Kathy Cook at page 37, in Exhibit G. In addition, Mr. Huff also recommended that CPC not be purchased because: "[he] felt like [CPC] had too much nursing home business, which [LabCorp does] not typically like to get into that type of business." (Deposition of Scott Huff, p.11 in Exhibit F). Unknown to CPC, when it signed the APA, LabCorp had announced that it was forgoing the nursing home medical lab servicing business.

(Emphasis in original).

       Considered in the light most favorable to plaintiff, this evidence arguably suggests that extrinsic business considerations may have been a factor in defendants's decision to back out of the planned purchase of CPC's assets. It is arguable, however, that the APA did not contemplate rescission of the deal based solely upon such business factors. Indeed, plaintiff notes that the APA made $500,000 of the planned $3 million purchase price contingent upon the meeting of business goals, and it argues that this indicates that the loss of an important customer such as OCW should have been addressed by a reduction in the purchase price, rather than in a withdrawal from the deal. While it is unclear whether a jury will find this argument persuasive, the court does conclude that the issue of defendant's motivation for rescinding the deal is a factual determination for a jury to make. There are a number of other evidentiary points which are contested by the parties, but there is no reason for the court to discuss them in this order. Indeed, while defendant clearly seems to have the stronger case, there are simply too many factual disputes in this case for this controversy to be resolved at the summary judgment stage.

The court would also note that, even if it could somehow resolve the main contractual issue in this case on summary judgment, there would still remain disputed facts regarding other claims in this case, including plaintiff's claim for breach of the confidentiality agreement. Plaintiff notes that, during the parties' negotiations, it provided defendant with a copy of valuable proprietary information, including customer lists. Plaintiff cites deposition testimony indicating that former LabCorp employee Louise Brown was terminated for "divulging confidential information about the acquisition of CPC," and it seeks partial summary judgment finding that defendant violated a confidentiality clause executed by the parties, with the issue of damages reserved for trial. The court disagrees that plaintiff has established a right to recover on this claim at the summary judgment stage, but it is apparent that triable fact issues do exist.

After the presentation of the evidence at trial, this court may pare down the parties' claims considerably at the directed verdict stage, and it may well limit the damages which plaintiff may recover in this action. Indeed, some of the arguments raised in defendant's motion for partial summary judgment on the issue of damages appear to have considerable merit, and this court will not permit plaintiff to recover damages which are based on speculation. At the same time, plaintiff has claims which narrowly pass scrutiny under the highly deferential summary judgment standard, and the court therefore concludes that a trial is necessary in this matter. This court sees little reason to pre-judge the issue of damages before plaintiff has even presented its proof, and the motion for partial summary judgment on damages, like the other summary judgment motions, will therefore be denied.

In light of the foregoing it is ordered that the summary judgment motions filed by the parties [188-1, 191-1, 195-1, 197-1] are denied. Defendant's motion [193-1] for leave to exceed

page limitations is granted, and plaintiff's motion to strike [203-1] is denied.

SO ORDERED, this the 6th day of July, 2009.


**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**